MARKMAN, J.
oconcurring). I concur fully with the majority opinion. I write separately to respond briefly to Justice CORRIGAN’s dissent and to emphasize one point that I believe is implicit in the majority opinion, but ought to be made explicit.
First, what separates the dissenting justices from the majority justices is not the former’s conviction that defendant’s 30-year minimum sentences “fall within the range of reasonable opinions regarding what sentences are appropriate in this case.” Post at 357. Rather, it is the latter’s conviction that the Legislature’s purposes in enacting the sentencing guidelines— *320 in particular the attainment of reasonably uniform and proportionate criminal sentences — can only be achieved if the guidelines are understood to mean what they say. Justice CORRIGAN fails to take sufficient account of the dispositive language in the present controversy:
A court may depart from the appropriate sentence range established under the sentencing guidelines set forth in chapter XVII if the court has a substantial and compelling reason for that departure and states on the record the reasons for departure. [MCL 769.34(3) (emphasis added).][1]
Thus, we can derive the following from this statute: (1) it is the sentencing court that must “stated on the record the [substantial and compelling] reasons for departure,” not the appellate court, and (2) the sentencing court must articulate its reasons in support of “that” departure, not “some” departure, not “any” departure, and not “a” departure.[1]
[2]
These requirements are an obvious function of the overall purpose of the guidelines, which is to diminish the sentencing discretion of individual judges, and to temper *321 aberrational or idiosyncratic sentencing decisions by substituting legal rules. The guidelines are intended to eliminate widely disparate sentences in which punishments may be more closely related to the predispositions of individual judges than to the predispositions of the people, as reflected through their representatives. Uniformity and proportionality of criminal sentences simply cannot be attained if departure sentences are largely exempted from legal rules under the guidelines, and MCL 769.34(3), in fact, establishes these rules: (a) the requirement that the sentencing court articulate reasons why a guidelines-range sentence is inadequate, and (b) the articulation of reasons in support of a specific departure sentence.[3] Notwithstanding, for example, that each lies outside a guidelines range of 9 to 15 years, there is a considerable difference between a 16-year and a 30-year minimum sentence, and the sentencing court must sufficiently justify these different decisions. This is not, as Justice CORRIGAN suggests, because of any “unreasonably burdensome” requirements imposed by this Court, post at 356, but because the Legislature has required this. The question in reviewing criminal sentences is not whether a sentence is “reasonable, ” post at 357, but whether it is lawful, i.e., in compliance with both the substance and the procedure of the guidelines.
Were Justice CORRIGAN’S position to prevail, the reforms achieved by the sentencing guidelines would be significantly undermined. The goal of reasonably uniform punishments, in which similarly situated offenders are ac *322 corded reasonably similar punishments, would be significantly diluted. Defendant here, like every other criminal defendant, is entitled to be sentenced within the minimum-sentence range recommended under the legislatively mandated guidelines range, which, for defendant, has as its maximum 15 years’ imprisonment. That is because this is the law. It can be assumed that each and every criminal sexual exploitation of a child is “heinous” and “atrocious,” and yet this remains the punishment the people of Michigan have seen fit to establish in their law. When, however, there is a basis for an upward departure from the guidelines because there are factors that have not been taken into consideration, that departure is permissible, but it too must be done in accordance with the law. The sentencing judge may depart from the guidelines range, but he must articulate the basis for doing so, and he must explain why an alternative sentence better comports with the aims of the law, in particular the law’s pursuit of proportionate and uniform criminal sentences.
Justice CORRIGAN would essentially exempt from these standards that part of a potential criminal sentence lying outside the guidelines range, which in the present case would exempt nearly 90 percent of defendant’s potential sentence from even rudimentary appellate review.[4] Defendants sentenced within the guidelines range would be subject to the standards of proportionality and uniformity, while defendants sentenced outside this range would be restored to a preguidelines environment in which individual judges could impose widely disparate sentences without mean *323 ingful appellate review. Once grounds have been articulated for proceeding outside the guidelines range (in this case, a minimum sentence of 9 to 15 years), it would be of little moment whether the sentencing judge imposed a 16-year or a 30-year sentence following an upward departure, or an 8-year or a 2-year sentence following a downward departure, for the dissenting justices see little need to justify the actual sentence given to a defendant.[5]
The sentencing guidelines were designed to restrain judicial sentencing discretion, so that punishments would effectively be determined by the people through their representatives, rather than by the serendipity of whether Lenient Larry or Maximum Mike happened to be the sentencing judge. The direction of the dissents is toward the restoration of a system in which citizen judgments concerning appropriate criminal punishments would be supplanted by the decision-making of individual judges. In place of what has proven to be a successful reform of the criminal-justice system, and the attainment of a heightened rule of law, the dissenting justices, by eroding the sentencing guidelines, would restore a heightened rule of judges.
Second, I would emphasize that the majority does not assert that analogizing to the sentencing grid constitutes *324 the exclusive means by which a court may seek to justify a particular departure; rather, it holds that some means is necessary to “justify why [the sentencing court] chose the particular degree of departure,” ante at 318, and that using the sentencing grid constitutes one “potential means of offering such a justification.” Ante at 306.1 agree with this.
However, one additional logical method by which to justify a particular departure, perhaps not worth belaboring because of its obviousness, is for the court simply to compare a sentence to others imposed in reasonably similar cases. This method derives from the basic principle underlying our sentencing system: securing a proportionate criminal sentence. A proportionate sentence is one that adequately reflects “ ‘the seriousness of the defendant’s conduct and... the seriousness of his criminal history.’ ” Ante at 305, quoting People v Babcock, 469 Mich 247, 264; 666 NW2d 231 (2003). Assessing the seriousness of a defendant’s conduct and his criminal history necessarily entails that a sentencing court will engage in some comparison between criminal offenses. That is, the seriousness of a defendant’s conduct and a defendant’s criminal history is not measured in a vacuum; rather, in answering the question of how “serious” a crime is, the court is essentially asking itself whether that crime is of greater or lesser gravity than other criminal offenses and “determining where, on the continuum from the least to the most serious situations, an individual case falls.... ” People v Milbourn, 435 Mich 630, 654; 461 NW2d 1 (1990). Thus, a comparison of a departure in one case to those imposed in reasonably similar cases constitutes one reasonable method by which a sentencing court may seek to fashion a proportionate sentence.
It may well be that judges initially will primarily consider reasonably similar cases decided by themselves *325 or by geographically proximate judges.[6] Thus, there may be some anecdotal or arbitrary quality to this process, which must be cautioned against. However, over time, as the guidelines, and judicial interpretations of these guidelines, become more deeply embedded in our justice system, it may be expected that more sentencing data will be collected and maintained, and that judges will possess some greater capacity to search broadly for relevant cases with which to compare their own. Especially as more appellate decisions are rendered with regard to departure sentences, case comparisons should become increasingly useful and less a matter of happenstance.
Thus, along with analogizing to the sentencing grid, one additional method for justifying a particular departure is to simply look to sentences imposed in reasonably similar cases. Given the current limited availability of such information in the legal marketplace, this will not always be possible, but where it is available, it should be welcomed and used. In appropriate instances, such information can assist the sentencing court in properly placing a case along a continuum of reasonably similar cases, and thereby fashioning a more proportionate and uniform sentence.

 Justice CORRIGAN criticizes the majority for relying on a “single word” — “that”—in MCL 769.34(3). Post at 352. However, this Court “interprets every word, phrase, and clause in a statute to avoid rendering any portion of the statute nugatory or surplusage,” Herald Co v Eastern Michigan Univ Bd of Regents, 475 Mich 463, 470; 719 NW2d 19 (2006) (emphasis added). To recall merely one previous decision in accord with this rule, we have placed great weight on whether “a” or “the” was employed in a statute. See Robinson v Detroit, 462 Mich 439, 461-462; 613 NW2d 307 (2000).

 Justice Corrigan would essentially compress what is in reality a two-part burden on the sentencing court into a single burden, by requiring the court to ask simply if “substantial and compelling” reasons exist for a departure. If so, then no further explanation would be required concerning the extent of a departure. She reaches this conclusion by removing from context MCL 769.34(11), which addresses appellate review generally, instead of harmonizing that provision with MCL 769.34(3), which sets forth a sentencing court’s specific burdens under the sentencing guidelines.

 Although Justice CORRIGAN asserts that the majority “enacts a new, corollary sentencing regime by extending the sentencing guidelines to apply to departure sentences,” post at 330, all that the majority asserts in reality is that departure sentences are no more exempt from the restraint of legal rules than non-departure sentences. The articulation of a “substantial and compelling” reason for departing from the guidelines does not constitute an all-purpose warrant for a departure of any magnitude.

 Reflecting a theme running throughout her opinion, Justice Corrigan asserts that the majority opinion will result in “incomplete scrutiny” of departure sentences. Post at 334 n 4; see also note 6 of this opinion. However, in pursuing the goals of uniformity and proportionality among departure sentences, it is hardly compelling to argue that this is better not done at all than through imperfect means.

 Justice Corrigan asserts that departure sentences are “not governed by the general rule of uniformity” that applies to guidelines-range sentences, because “[d]eparture sentences generally involve less quantifiable facts____” Post at 338, 337-338. However, “quantifiabiliiy” is not the distinguishing characteristic between guidelines-range sentences and departure sentences. That is, a departure sentence may be based on nothing more than the fact that the guidelines do not fully account for the sheer number of victims harmed by the defendant, a readily “quantifiable” number. Moreover, departure sentences must be based upon “objective and verifiable” factors, People v Babcock, 469 Mich 247, 257-258; 666 NW2d 231 (2003), hardly a synonym for “non-quantifiable.” There are not two tiers of criminal sentences in Michigan, one in which uniformity and proportionality are sought, and another in which they are not.

 Justice Corrigan expresses her belief that “case comparison will [not] become meaningfully less arbitrary over time,” and that there exists a “potential to increase disparities in local sentencing practices.” Post at 331-332 n 2. However, better that there be imperfect comparisons than no comparisons at all, as apparently preferred by Justice Corrigan. Over time, as sentencing data accumulate under the guidelines, as I believe it will, such comparisons will increasingly tend to become valuable in achieving reasonable sentencing uniformity and proportionality. I fail to see any “inconsisten[cy],” id. at 332, in my belief that comparisons of cases constitute one essential and obvious means of furthering these goals.